[Civ. No. 12500.   Second Dist., Div. One.—June 30, 1941.]

MYRTLE D. WOMAR, as Executrix, etc., Plaintiff and Appellant, v. THE CITY OF LONG BEACH (a Municipal Corporation), Defendant and Appellant.

644

J. S. Le Page, *in pro. per.,* and Davis & Pitney for Plaintiff and Appellant.

Irving M. Smith, City Attorney, Nowland M. Reid, Assistant City Attorney, and Clifford E. Hayes and Roy J. Brown, Deputies City Attorney, for Defendant and Appellant.

DORAN, J.—The appellant city appeals from a judgment herein whereby appellant, as defendant, "is perpetually enjoined from causing or permitting the surface waters on Atlantic Avenue or Hill Street, or the intersection of said streets, in the City of Long Beach, State of California, resulting from rainfall, usual in nature and not extraordinary or unprecedented, to flow upon plaintiff's real property at the southwest corner of said intersection of said streets, or to flow, collect or concentrate upon said streets, or said intersection, in such quantities as to interfere with the ready ingress to and egress from plaintiff's said real property", and whereby certain damages were assessed against appellant for injury to property caused by the flooding of the said real property. Plaintiff has also appealed from that portion of the judgment which limits relief only from the effects of usual rainfall, contending that the decree should have provided for relief from all rainfall of whatever nature. The plaintiff died prior to the hearing on the appeals herein and his executrix, Myrtle D. Womar, has been substituted as party plaintiff in the place and stead of J. S. LePage. However, to avoid confusion, and for convenience, the terms "plaintiff", "respondent" or "appellant" will be applied as though such a substitution had not been made, and will be understood hereinafter to refer to the original plaintiff in this action, as appellant or respondent, as the case may be.

At the time of the commencement of this action respondent plaintiff was the owner of a lot located at the southwest corner of the intersection of Atlantic Avenue and Hill Street in the city of Long Beach, the lot being improved with a one-story brick building containing two store rooms, one occupied as a drug store and the other as a restaurant. Respondent brought the instant action against the appellant city, alleging that the appellant, by the grading of Hill Street and Atlantic Avenue at and near their intersection, and by the grading of other streets in the general locality, caused surface run-off water to be diverted to and accumulate upon Atlantic Avenue and Hill Street and to overflow into the respondent's building, thus causing damage to respondent's building and to the personal property of respondent's tenants (who assigned their claims herein to respondent). The prayer was for the abatement of the nuisance thus allegedly created and for damages.

The trial court found that the appellant city had created a nuisance at and near the said intersection and gave judgment for the plaintiff as above stated.

. For the purposes of consideration upon this appeal by the city, the intersection of the streets in question lies somewhere near the center of an area in the City of Long Beach bounded by State Street on the south, the right of way of the Pacific Electric Railway on the north, California Avenue on the east and American Avenue on the west. Atlantic Avenue runs north and south, Hill Street east and west. Elevation charts, contour map and relief map introduced in evidence reveal the area to be generally low land.

Running from State Street on the south to Burnett Street on the north, two blocks north of Hill Street, the elevation along Atlantic Avenue drops approximately seven feet. The general drop in elevation along Atlantic Avenue from State Street north to Hill Street is about five feet. Along Hill Street, running west into Atlantic Avenue, covering a distance of several blocks, the elevation drops roughly about one foot; and running east along Hill Street to its intersection with Atlantic Avenue, covering about the same distance, the elevation drops about three feet. The elevations mentioned, according to the maps in evidence, are ''derived from property line grades based on Old Long Beach Datum Plane''. Within the area bounded as above the land slopes generally to the northwest, with the exception of the extreme lower southeast section, where the slope is to the southeast. Atlantic Avenue, from State to Hill Street, appears to mark a low point on streets crossing it from east to west. In other words, the land directly east and west of Atlantic Avenue, over the territory mentioned, slopes toward Atlantic Avenue. At the intersection of Atlantic Avenue and Hill Street the general elevation is about 20 feet, and this general elevation prevails to 23rd Street, one block north of the said intersection, where there is a drop to 19 feet. The elevation at the southwest corner of Hill Street and Atlantic Avenue, the location of plaintiff's property, is given as being from 20.2 to 20.6.

In January 1907 the grades on Atlantic Avenue north of Anaheim Street were established by a resolution of the Board of Trustees of the City of Long Beach, which resolution established the grade at the southwest corner of Atlantic Avenue and Hill Street at 19.2 feet. In July 1913 the

grades on Hill Street in the area above described were established by ordinance of the city, whereby the grade of Hill Street at the west line of Atlantic Avenue was established at 19.1 and at the east line thereof at 19.2 feet. It is not disputed that both streets were graded to the grade so established.

The maps in evidence indicate a fairly large natural depression existing in the block at the southeast corner of Hill and Atlantic in a state of nature. The elevation in this depression is shown as 19 feet. The existence of such a depression was borne out by the testimony of witnesses for both sides. It appears that water collected there when it rained and that upon occasions there was a considerable body of water at that point. At the time the property was subdivided there was a "pond" there, and the depression was thereafter filled in. Witnesses for both sides gave evidence that the intersection in question had been flooded during rains before as well as after the grading of the streets; and it appears from the testimony that the entire area had always been more or less subject to flooding during heavy rains. At least one witness, an old inhabitant, testified to having seen the southwest corner of Hill and Atlantic "under mud and water" prior to the time the streets were graded. His testimony, together with that of the other witnesses for both sides clearly established the existence of a serious drainage problem in the area, a problem created by the natural topography of the land coupled with conditions of rainfall peculiar to a semi-arid region like that of Southern California.

The trial court found that the surface of the lands embraced within the general area under consideration, south of Hill Street, "had a gradual slope and fall to the east into a large natural sump or basin east of said block of territory"; and that the lands north of Hill Street largely sloped and drained to the northwest. Appellant city attacks this finding as not supported by the evidence, and the attack thereon is plainly justified. As already pointed out, the maps in evidence established a general slope of the land to the north or northwest in all but the portion of territory lying to the southeast. The accuracy of the maps is not disputed, nor is there any competent evidence to the contrary. In fact the disputed finding is contrary to the allegations of the complaint in this respect. This finding established a natural

divide at Hill Street between surface waters flowing to the north and those flowing to the south. Apparently no such divide existed at this point. The general slope both north and south of Hill Street definitely appears to be toward the north and northwest. Since the court also found that the grading of the streets in question altered the course of the surface water in the area, and since the court's decision appears based, at least in part, on a theory of wrongful diversion of surface waters, the finding of the court as to the direction of surface waters in a state of nature is necessarily material and the error in this respect must be held to be prejudicial.

The trial court also found "that in a state of nature there was no natural depression or basin of appreciable size and dimensions upon or about said intersection of Hill Street and Atlantic Avenue where the surface run-off waters from any of the said territory stood in any appreciable quantity; that prior to the grading of said streets and alleys the surface run-off waters flowing thereon were much less in quantity than thereafter". Appellant city assigns as error that portion of such finding concerning the existence of a depression where surface waters stood.

It has already been pointed out that the evidence established the existence of a natural depression at or near the southeast corner of the intersection in question and that the intersection itself had been flooded in times of heavy rainfall prior to the grading of the streets.

In considering this latter finding of the court here attacked by appellant city, it would be well to quote at length certain other findings in order to present more clearly the situation as found by the trial court. The quotations immediately following are from findings VI, VII and VIII of the trial court.

"It is true that on January 22nd, 1907, defendant established the grades of Atlantic Avenue north from Anaheim Street to the south line of Hill Street and at such a grade in front of plaintiff's lot that a cut and excavation on said street was to be made to the depth of 16 inches, the same ending at the south line of Hill Street with an uprise thereat; that Atlantic Avenue was soon thereafter graded down and curbs thereof were set in conformity to the grades so established; that rains caused the excavation so made in front of

plaintiff's lot to fill up with surface run-off waters from south Atlantic Avenue to the surface level of the lots thereat, the surplus thereof flowing on northward; that after said conditions had so remained for some time, defendant excavated an open drain westward on Hill Street from said intersection, and also another open drain northward on Atlantic Avenue for the purpose of draining the said basin on Atlantic Avenue in front of plaintiff's property, and the two open drains so constructed drained said basin dry; that such drainage was insufficient and inadequate to carry off the said surface waters as fast as they arrived at the time of heavy showers of rain, and the said basin continued to fill up and flood to the level of the surface of the surrounding lots; that during such times there was a frame grocery and residence building located on the natural surface of plaintiff's lot; that such floodings at said times never invaded the natural surface of plaintiff's lot; that when said basin so filled up with flood waters the surplus thereof continued to flow northward therefrom;

"It is true that thereafter defendant imbedded a corrugated pipe in said open ditch on west Hill Street for the purpose of more effectively draining said basin, but nevertheless, such drainage was also insufficient and inadequate, and said basin continued to fill up with flood waters at heavy showers of rain; that on July 10th, 1913, defendant established the grades of Hill Street from American Avenue to California Avenue, which involved a drop from American Avenue to the intersection in question of about 16 inches and from California Avenue to said intersection of two and one-half feet; that soon thereafter the defendant excavated and graded down said Hill Street in accordance with the grades thereof so established, which grades and excavations for said intersection were made in conformity to the grades and excavation so made in front of plaintiff's property on Atlantic Avenue; that said intersection and Atlantic Avenue in front of plaintiff's property was excavated to a depth 16 inches lower than the original surface thereof and of plaintiff's lot; that Hill Street west of said intersection to American Avenue was graded down from two to three feet so that said run-off waters arriving on it were channeled to the intersection of Hill and Atlantic; that Hill Street east of Atlantic Avenue to California was so graded down as to channel

all run-off waters arriving on it to the intersection of Hill and Atlantic also; that all said avenues and alleys of said territory were so graded down as they approached Hill Street both from the north and south thereof as to conform to the grades and excavations of Hill Street and said intersection; that Atlantic Avenue and Hill Street thereby were made channels to convey run-off waters to said intersection, the result of which grading was and is to make an unnatural basin and depression at and about said intersection of Hill Street and Atlantic Avenue wherein a large part of the run-off waters of said large block of territory are concentrated; *that such grading of Hill Street and the intersection in question made the basin much larger than formerly;* that after Hill Street had been so graded down, the present brick building on plaintiff's lot was in process of erection in the latter part of 1913 or the first part of 1914, and was uncompleted, at which time the said basin flooded with run-off waters from said streets, and also flooded the lot and invaded the building of plaintiff, the cement floor of which was from four to six inches above the grades so established;

"It is true that thereafter said basin and plaintiff's building continued to flood at the time of heavy showers of rain until the year 1916, at which time defendant constructed a 30 inch drain westward from said intersection on Hill Street, for the purpose of more effectively draining away said flood waters concentrating in said basin; that the drainage thus provided did not wholly relieve the flood conditions in said basin, and the said basin continued to flood at the time of heavy showers of rain from one to three times every wet season thereafter; that said floods continued to invade the premises now owned by plaintiff to the depth of 8 or 9 inches in said store building; that the surplus flood waters not so drained off through said 30 inch drain continued to course north on Atlantic Avenue through said open drain; that such conditions existed until the year 1925, at which time defendant graded and paved with concrete Atlantic Avenue north from said intersection to Burnett Street and beyond; *that by such grading and paving a "hump" was left thereon,* the crest of which was distant 400 feet from said intersection; that the street sloped and drained from the crest thereof down to said intersection; that said "hump" was of such height that it has ever since caused said surface waters to be imprisoned in said basin from said crest thereof to said in-

tersection; . . . . that subsequent to the time of paving Atlantic Avenue north of Hill Street, the overflow waters at said intersection not drained away through said 30 inch drain coursed on north over said "hump" on north Atlantic Avenue to Burnett Street to a drain extending northwestward; *that said grading did change and alter the course and volume of surface water of the area through which said streets extended, and said grading did increase the volume of surface water so concentrating at and about said intersection over that which reached said intersection in a state of nature".* (Italics added.)

Respondent plaintiff's case appears to rest upon the facts as set forth in the above quoted findings, namely, that the grading of the streets by the city created a large basin at the intersection of Hill Street and Atlantic Avenue wherein surface waters collected to a greater extent than in a state of nature. Respondent plaintiff contends that the making of this basin was absolutely unnecessary and constituted an engineering blunder of the "first magnitude".

The chart of surface elevations in evidence reveals the following data. The elevations along Atlantic Avenue in the block directly south of Hill Street reach a high point of 21.2 on the west side and 20.8 directly opposite on the east side. This is in the middle of the block, or about 300 feet south of Hill Street. From there, on the west side of Atlantic Avenue the elevation drops to 20.2 at the south line of Hill Street, and on the east side of Atlantic Avenue the elevation drops to 20.4 at the said south line. The elevation on the west side of Atlantic Avenue then rises from 20.2 on the south line of Hill Street to 20.7 on the north line thereof; and on the east side of Atlantic Avenue the elevation rises from 20.4 on the south line of Hill Street to 20.8 on the north line thereof. North of Hill Street, the elevation along the east side of Atlantic Avenue continues at 20.8 for the next hundred feet, dropping to 20.3 in the second hundred feet, to 20.2 in the third hundred, and to 20.1 four hundred feet from the north line of Hill Street. The elevation along the west side of Atlantic Avenue north of Hill Street runs from 20.7 at the north line of Hill Street to 20.3 100 feet north of the said line, to 20.4 at 200 feet, to 20.0 at 300 feet and to 20.1 400 feet north of the said line of Hill Street. The elevation along the south line of Hill Street, from the

west line of California Street, four blocks east of Atlantic Avenue, to the east line of Atlantic Avenue, drops from 21.5 to 20.4; and along the north line of Hill Street between the same points, the elevation drops from 22.2 to 20.8. West of Atlantic Avenue, the elevation along the south line of Hill Street drops irregularly from 22.3 at the east line of Elm Avenue, three blocks west of Atlantic, to 20.2 at the west line of Atlantic Avenue; and along the north line of Hill Street, between Elm and Atlantic Avenues, the elevation drops irregularly from 21.9 to 20.7. It should be noted that about 500 feet west of Atlantic Avenue the elevation on the south line of Hill Street is 22.2, and on the north line thereof 22.0.

Thus, the elevation chart shows that the intersection of Hill and Atlantic marks a low point in the natural elevation along these two streets. Also, it would appear that a depression was formed by a rise in the land of about one foot 300 feet south of the intersection, a more or less abrupt rise of about six inches immediately north of the intersection, a somewhat gradual rise of about one foot to the east, with a sharper rise of about two feet to the west.

When the elevations given on the chart are coupled with testimony that rain waters tended to collect at the intersection of the streets in question before the same were graded, the only reasonable conclusion to be drawn is that the area was subject to flooding before the streets were graded.

From the profile charts in evidence it may reasonably be estimated that after the grading of Hill and Atlantic, the rise along Atlantic Avenue to the south was changed to approximately 8 inches in 300 feet, and the abrupt rise to the north of about 6 inches was changed to a uniform rise of about 8.4 inches in 400 feet; the grading of Hill Street changed the rise to the east to two feet over the distance to California Street, with a uniform rise to Elm Avenue on the west of approximately only 9 inches, rising only about three inches over the first 500 feet west of Atlantic Avenue. It would therefore appear that the grading of these streets had a tendency to flatten or broaden the depression previously existing. It is of course a natural phenomenon that the level of a given quantity of water will be lowered by spreading the water out over a broader area, all other things being equal. In any event, when the depression shown to have existed before the grading of the streets is compared with that

existing after grading, it cannot properly be said that no appreciable depression existed before grading and therefore the court's finding to this effect is not supported by the evidence.

Respondent complains that in establishing the grades of Hill Street and Atlantic Avenue the level of the streets was lowered 16 inches. It should be pointed out that insofar as the creation of a depression at the intersection is concerned the factor to be considered is not the level to which the streets were lowered, but the slope or grade at which the streets approached the intersection. The level of the intersection may have been considerably lowered, and yet, in so doing, the city might have been enabled to establish a more gradual approach. From all that appears in the record, this was the situation in the instant case.

Moreover, in the absence of convincing evidence to that effect, it may not be said that the establishment of a street grade so as to remove a "hump" of six inches occurring directly at an intersection, and to replace that hump with a gradual rise of a little over eight inches to a point 400 feet from the intersection, constitutes an engineering blunder of the first magnitude. It should be stated that the only expert engineering testimony offered in this case was that on behalf of the defendant and that the same stands generally uncontroverted by any other evidence. It should also be pointed out that at the point in question 400 feet north of the intersection, the grade of Atlantic Avenue, according to the profile chart heretofore referred to, is little if any above the natural elevation at that point. In other words, the grade at that point closely approximates the natural elevation of the land.

In view of the conclusions reached with regard to the findings heretofore noted and their lack of support by the evidence, the decisive question remains, namely, do the other findings support the judgment? Stated otherwise, the question is whether, upon the facts shown, plaintiff is entitled to any relief in the premises as a matter of law.

The instant action was instituted and the cause apparently tried upon the theory of nuisance. It appears to be the contention of respondent plaintiff, and it was so found by the court, that the flooding of the intersection in question after the grading of the streets constituted a private nuisance as to plaintiff for which the appellant city was responsible and

which appellant city was bound to abate. Although the court found that the nuisance was created "through the negligence of defendant in failing to remedy said conditions caused by said usual heavy rains", such a finding is not supported by any evidence of negligence upon the part of the city in establishing the grades of the streets in question, or in the work of grading or paving the same, or in the construction and maintenance of drains; and must rest, if at all, upon a duty imposed on appellant city to eliminate the flooded condition caused by the collection of surface waters at the intersection.

An extensive note on the rights and duties of municipal corporations with respect to surface water is found in 65 L. R. A. 250 (1904), wherein, as to the duty to keep water off abutting property, it is said, at p. 252:

"Steps for the improvement of a highway cannot proceed far before natural conditions are changed, and the surface water from the street becomes a more serious burden upon the abutting owner; and the question then arises as to the duty of the municipality with respect to it. In the natural condition of the highway, the surface water flows naturally to the lowest level, and the burden rests where it falls, either on the highway, or on the adjoining property. Neither the public, nor the abutting owner, is under any obligation to care for the water for the benefit of the other.

"The mere existence of a highway does not make it the duty of the town or city where the highway is to keep the water flowing in it from overflowing on the adjoining lands. Such a duty devolves on a town or city only when it has done something to increase the volume of the water, or to accumulate it in unusual quantities at some particular point of the highway. *Smith* v. *Tripp,* 13 R. I. 152.

"A village is not liable for the overflow of private property resulting from the inadequacy of its drains constructed for the purpose of carrying off the surface water from its streets, where such property was the natural depository of all the waters discharged thereon. *Dudley* v. *Buffalo,* 73 Minn. 347, 76 N. W. 44. . . .

"It is not the duty of a municipal corporation to prevent the flow of water from its streets onto the lands of abutting proprietors. *Montgomery* v. *Gilmer,* 33 Ala. 116, 70 Am. Dec. 562. A municipal corporation is not liable for failure to take steps to prevent surface water from a large area of territory

from flowing in its natural course, so as to flow and accumulate upon the land of a particular individual. *Beals* v. *Brookline,* 174 Mass. 1, 54 N. E. 339. . . .

"The fact that a city, after notice that drains constructed to carry off street surface water are insufficient, fails to use ordinary diligence to make them serve the purpose intended, does not render the city liable for an overflow of private property by surface water from the street where it did not accelerate the flow of water, or collect the same, and discharge it on such property otherwise than it would naturally have been discharged thereon, when it was not negligent either in devising or adopting the plan of the drains. *Knostman & P. Furniture Co.* v. *Davenport,* 99 Iowa 589, 68 N. W. 887.

"But the action of the surface water is a serious menace to the safety of the highway, and one of the first steps for its improvement is the adoption of means to relieve it of such menace. This may be accomplished by raising the grade so as to prevent the water from settling on the street, by making the surface more impervious, to prevent the water from saturating the roadway, and by the construction of drains to carry it to some other point. All of these proceedings have more or less effect on the adjoining property. The general rule is that so far as the circumstances of the case and public necessities will permit, the same rules concerning injuries to private property by the overflow of water should be applied to municipal corporations in the management and improvement of their streets as would be applied to private individuals in the management and use of their property. *McClure* v. *Red Wing,* 28 Minn. 186, 9 N. W. 767; *Pye* v. *Mankato,* 36 Minn. 373, 31 N. W. 863 [1 Am. St. Rep. 671]."

And in the same annotation, at page 253, et seq., it is stated:

"A town is not liable for allowing water to flow from a highway onto the land of another, where it appears that the water would naturally flow from the highway upon the land; and in such a case an action will not lie for the results of such usual changes of grade as must be presumed to have been contemplated and paid for at the lay-out of the highway. *Wakefield* v. *Newell,* 12 R. I. 75, 34 Am. Rep. 598.

"Authority to establish grades for streets, and to graduate them accordingly, involves the right to make changes in the surface of the ground which may affect injuriously the adja-

cent property owners; but, where the power is not exceeded, there is no liability unless created by statute, and then only in the mode and to the extent provided, for the consequences of its being exercised and properly carried into execution. The owner of the property may take such measures as he deems expedient to keep surface water off from him, or turn it away from the premises onto the street; and, on the other hand, the municipal authorities may exercise their power in respect to the gradation, improvement, and repair of streets, without being liable for the consequential damages caused by surface water to adjacent property. *Allen* v. *Paris,* 1 Tex. App. Civ. Cas. (White & W.) Sec. 885, p. 506. . . .

"Very few cases present the simple fact of changing the grade so that the course of the water between the adjacent land is merely altered. In addition to this, additional facts usually exist, such as the gathering of the water, or the change of outlet for a flow coming from an extended territory. Either of these facts would give a right of action against a private individual (see note to *Gray* v. *McWilliams,* 98 Cal. 157, 32 Pac. 976, 35 Am. St. Rep. 163, 21 L. R. A. 593), and there is no reason why it should not do so against the municipality. In the cases in which the courts have denied the right of action, the full effect of the principles involved does not seem to have been considered. In many instances a street improvement consists, in part, at least, of the hardening of the surface so as to make it impervious to water. The effect of this hardening, together with the slope given to the surface, is to accumulate the water at the edge of the street and cast it in a body on the land of the abutting owner. The principal reason at the bottom of the rule that there is no liability for altering the grade of land so as to interfere with the flow of surface water is that most of the water coming from rain and melting snow finds its way immediately into the ground, and there is no great quantity to flow along the surface. The hardening of the surface of the street interferes with this natural condition as much as the placing of a building on the land with a roof extending over its entire surface. And no one contends that a private owner can place such a building on his land, and allow the eaves to cast the water immediately on his neighbor's land, without making any provision for caring for it. Another element which is involved in the improvement of a highway is the bringing of the surface to uni-

form grade over long stretches of territory, the effect of which is to cause the water to flow along the street for a considerable distance, thereby changing its natural course and gathering it in a body; and, when it is in that condition, no private owner can cast it immediately on his neighbor's land without liability. The rules governing the rights with regard to surface water, as between individuals, would make the municipality liable for its acts in either case if it did not make some provision to care for the water so accumulated and concentrated. Few of the courts, however, have considered these principles, but have regarded the street improvement merely as a change of grade, which was held to cast no liability upon the municipality for its acts. When these principles have not been considered, and the courts have decided that there was no liability on the ground that the injury was consequential, or for some other equally evasive reason, the decision can be regarded as of little value, upon the principle of jurisprudence involved; and such decision is practically worthless as a precedent whatever its effect may be on the rights of the parties to the litigation. Therefore, in determining the correctness of any decision denying the liability of the municipality, the question must be kept in mind, whether it did anything more than merely alter the grade so as to change the direction of flow of the surface water between the highway and the adjoining land. If it did, on principle it is liable. . . .

"A municipal corporation is not liable for damage to private lands in consequence of changes in a highway pursuant to authority of law, as where more surface water is thrown on adjoining lands by the paving of the road. *Field* v. *West Orange Twp.*, 46 N. J. Eq. 183, 2 Atl. 236.

"But in California it was held that a city is bound to provide means for conducting away surface water in a street, the accumulation of which is the necessary consequence of the paving of the street; and is liable for damages to the adjoining premises at grade with the street, caused by its failure to provide such means. *Stanford* v. *San Francisco*, 111 Cal. 198, 43 P. 605.''

An annotation on the right to hasten by improvement of street or highway the flow of surface water along natural drainways is found at 5 A. L. R. 1530, supplemented in 36 A. L. R. 1463. In the original note it is stated: "The well-settled rule that the flow of surface water along natural de-

pressions or drainways may be hastened and incidentally increased by artificial means, so long as the water is not diverted from its natural flow, has been applied in the improvement of streets and highways by municipal authorities.''

In *Lessenger* v. *City of Harlan,* 184 Iowa 172 [168 N. W. 803], also reported at 5 A. L. R. 1523, and to which the annotation above referred to is appended therein, the situation involved the discharge by a city of surface water upon the lands of the plaintiff by means of a sewer. It appeared that in so doing the city was making use of a natural watercourse. The city was held not liable. Pertinent language is found in that case (at 5 A. L. R. 1527), as follows:

''Where a city has authority . . . to do a particular thing through its properly constituted officers, it cannot be held liable to a citizen for consequences that follow the doing, in the absence of some showing of negligence in the manner of the doing. A natural person has the right to a proper and profitable use of his own land, and if, in the exercise of such right, without fault or negligence, loss unavoidably occurs to his neighbor, the neighbor is without remedy. Cities and towns as such certainly are invested with as much immunity in the exercise of rights over their property as individuals. If in the doing of these things, which it has the right to do under the law for the public good, and for the proper and profitable use of its own territory, it causes, without negligence, injury to a citizen, the citizen is without remedy. If we should hold the city liable to individuals for consequential damages resulting solely from the improvement of the city in the grading, guttering, and paving of its streets, done properly and in strict accordance with the requirements of the statute, upon a simple showing that injury occurred from the doing, without any showing of negligence in the manner of the doing, we would be going a long way in preventing any improvement. If we should hold that the city is liable to a citizen for consequential damages, upon the simple showing that the city, in the lawful exercise of its right, without negligence in the manner of the doing, graded its streets, paved and guttered them, and, as an incident thereto and a consequence thereof, the surface water was diverted from the course it pursued in the state of nature, we would throw in the way of public improvement insurmountable stumbling blocks.''

In *Stanford* v. *San Francisco, supra,* cited in the above quotation taken from L. R. A., the city of San Francisco had paved a blind street, the surface waters on which had formerly all been absorbed by the unpaved sandy surface. The street sloped toward the plaintiff's premises, and after the paving of the street, the waters which were formerly absorbed collected on the surface at the termination of the street, broke over the curbing and ran into plaintiff's basement. No provision had been made for draining the water when the street was paved. The city was held liable therefor upon the proposition that there was a legal obligation resting upon the city to provide means for conducting away surface water, the accumulation of which was the necessary consequence of paving the street.

The Stanford case may be distinguished from the instant case upon the facts. In the instant case it does not appear that the accumulation of water was caused by the paving or grading of the streets. On the contrary, it appears that surface waters always collected to some extent at or near the intersection in question and that there had always been a drainage problem in the vicinity. In the Stanford case it is to be noted that the waters were precipitated upon plaintiff's premises solely because of the paving of the streets without means of drainage. In the instant case, from the evidence offered by respondent plaintiff it appears that the proximate cause of flooding was the excavation and grading down of plaintiff's lot for the purpose of erecting the brick building thereon. Furthermore, it does not appear that had said building been erected and the property excavated prior to the grading of the streets the same flooded condition would not have prevailed in times of heavy rain. From all that appears, had the property at that time been graded down to what was then the street level any building standing thereon might have been flooded. It is apparent, therefore, that the grading and paving of the streets contributed little, if anything, to the conditions which caused plaintiff's property to be flooded after the excavation and grading of the property for building purposes. The civil engineer who testified on behalf of appellant stated that water could not invade respondent plaintiff's lot as it stood at the time of trial if the lot had not been excavated below the natural level thereof.

The Stanford case is closely analogous to the situation in which the roof of a house extends over the entire surface of a lot, allowing the eaves to cast water immediately upon neighboring land without making any provision for caring for it, as mentioned in the quotation above. It is thus seen that in the Stanford case the act of the city in causing the surface waters to flow upon the plaintiff's premises constituted a direct trespass. But in the instant case there has been no direct causal connection established between the flooding of plaintiff's property and the paving and grading of the streets.

The same distinction may be drawn between the instant case and that of *Dick* v. *City of Los Angeles,* 34 Cal. App. 724 [168 Pac. 703], and of *Farrell* v. *City of Ontario,* 36 Cal. App. 754 [173 Pac. 392], both decided upon authority of the Stanford case. In both of these cases last cited the liability of a city for damages caused to real property was based upon the fact that it had graded its streets in such a manner as to cause surface water, *which theretofore had not flowed there,* to accumulate in unusual quantities and to be turned upon the land of the plaintiff. Both of these cases were decided upon a theory of trespass, as was the Stanford case.

In *Lampe* v. *San Francisco,* 124 Cal. 546 [57 Pac. 461, 1001], a municipal corporation was held not liable for damages resulting from the construction of an embankment in the grading of a street, which caused the surface water upon an adjoining lot situated below the level of the graded street to accumulate thereon, instead of flowing freely therefrom, as before the street was graded. It did not appear that the water flowed from the lot in well defined channels. At page 549, it is said: "In this case there is no allegation that the grading of the street caused surface waters to accumulate in unusual quantities, and that such surface waters were turned upon the lands of plaintiff." Of this last quoted language it is said in *Dick* v. *City of Los Angeles, supra,* at page 731: "The plain inference is that if such allegation had been made, the complaint would have stated a cause of action." It should be noted that had such an allegation been made the theory of trespass would have entered the case. As stated in the quotation above given from the annotation in L. R. A., the question must be kept in mind, whether the city did anything more than merely alter the grade. In other words, the test of the city's liability should be whether in the conduct of its

work the city committed an act of trespass upon the adjoining property, or was guilty of an act of negligence which proximately caused damage thereto.

Since in the Lampe case it was held that a city was not liable for raising the grade of a street, thereby preventing surface waters from flowing off property below the grade, it is difficult to see how, in the instant case, the city could be held liable for lowering the grade merely because the plaintiff thereafter lowered the level of the lot, bringing the surface of his property beneath that of waters accumulating on the street. Here there was no proof that the grading of the street caused surface waters to accumulate in unusual quantities, and that such surface waters were turned upon the lands of plaintiff. It should be emphasized that the evidence in the instant case fails to establish that the condition existing at the intersection in question was created or caused by appellant city.

In *White* v. *City of Santa Monica*, 114 Cal. App. 330 [299 Pac. 819], at 332, it is said: "Surface waters are largely regarded by the law as a common enemy, and where damage results solely as a consequence of the proper execution of a legal power of the municipality, there is no implied liability therefor." While the criticism of a doctrine of "consequential damage", as appears in the above quotation from L. R. A., should be borne in mind, nevertheless, the characterization of surface waters as a common enemy serves more clearly to reveal the position of appellant city in the instant case. Appellant city was here confronted with a difficult drainage problem in a low lying area, and in the effort to combat flood waters and to solve the problem the city, in the light of the authorities, could not be held strictly accountable merely because it failed to completely remedy the existing condition.

Respondent plaintiff contends that had the city followed a plan such as respondent undertakes to outline, the problem would have been solved. But it must be pointed out that the city cannot be held liable because it chose to put into execution one of a number of plans. The plan adopted cannot be attacked merely by showing that some other plan might have been more feasible; and, as a matter of fact, it does not even appear that respondent's proposed plan would be more feasible.

■ It is not contended that there was a statutory duty imposed upon appellant city to do more than it did in seeking to remedy the condition at the intersection; and, as already pointed out, there is no evidence of actual negligence or direct trespass in connection with the construction and maintenance of the drains in question. Any liability of appellant city with regard to the drainage must therefore be predicated upon a duty to provide adequate drainage. But it would appear that no civil liability attaches for failure to provide adequate drainage under the circumstances of the instant case. (See the article on Municipal Corporations, 19 R. C. L. 1089, 1091, 1102.) While the authorities are not in harmony upon the subject, liability of a municipal corporation for failure to provide adequate drainage, aside from specific statutory liability, appears to be based upon a theory of either negligence or direct trespass. In an extensive annotation upon the duty and liability of a municipality with respect to drainage at 61 L. R. A. (1903) 673, it is stated at page 684: ''The true distinction is well stated in *Tate* v. *St. Paul,* 56 Minn. 527, 58 N. W. 158, as follows: To determine when, and upon what plan a public improvement shall be made, is, unless the charter otherwise provides, left to the judgment of the proper municipal authorities, and is in its nature legislative; and, although the power is vested in the municipality for the benefit and relief of property, error of judgment as to when or upon what plan the improvement shall be made, resulting only in incidental injury to the property, will not be ground for the action. But, for the direct invasion of one's right of property, even though contemplated by, or necessarily resulting from, the plan adopted, an action will lie; otherwise it would be taking private property for public use without compensation.'' (See also case note in 1 L. R. A. (N. S.) (1906) 952; and note in 70 A. L. R. 1347.)

■ The question here being one solely of the duty of appellant city to provide adequate drainage, and it appearing that there was no absolute duty imposed upon appellant to do any more than it had done under the circumstances, and there being no evidence of negligence or trespass on the part of the city, or of the condition having in any manner been caused by the city, it follows that the trial court was not justified in finding upon the evidence presented that the con-

dition complained of existed through the negligence of appellant city in failing to remedy the same.

Moreover, although conceding for the sake of argument that the flooded condition of the intersection plainly constituted a nuisance, the appellant city was in no way shown to have created it or maintained it and should not therefore be subject to a civil suit compelling its abatement.

Nor can the inadequacy of the drains themselves be considered a nuisance. "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." (Section 3482, Civil Code.)

The record in the instant case reveals the injuries to plaintiff's property to have been caused by a set of unfortunate natural circumstances for which the law provides no remedy. It is not necessary, therefore, to consider the question of possible negligence on the part of plaintiff's predecessor in grading his lot to the level of the street under the conditions existing; and since it appears that plaintiff is not entitled to any remedy against the city upon the record presented it will not be necessary to consider here the appeal taken by plaintiff from a portion of the judgment.

The judgment is reversed for the foregoing reasons, with directions to the trial court to enter judgment for defendant.

York, P. J., and White, J., concurred.

Plaintiff and appellant's petition for a hearing by the Supreme Court was denied August 28, 1941. Carter, J., voted for a hearing.