[Civ. No. 46038. Second Dist., Div. Five. May 10, 1976.]

TRI-CHEM, INC., et al., Plaintiffs and Appellants, v.
LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al.,
Defendants and Appellants.

**COUNSEL**

Dolman, Kaplan, Neiter & Hart, James M. Leonard and Gerald I. Neiter for Plaintiffs and Appellants.

John H. Larson, County Counsel, Terry C. Smith, S. Robert Ambrose and Max E. Truex, Deputy County Counsel, Buck & Smith and Mark D. Rutter for Defendants and Appellants.

**OPINION**

**KAUS, P. J.**—These consolidated property damage cases arise out of flooding which occurred in January 1969 at an industrial park area in the City of Torrance.

Plaintiffs Tri-Chem, Inc., and Taco Bell filed actions for damages against defendants City of Torrance ["City"], County of Los Angeles and Los Angeles County Flood Control District ["County"] on theories of inverse condemnation, negligent design and maintenance, and nuisance. The case went to a jury on an inverse condemnation theory as to all defendants and on a negligence theory only as to defendant City.[1]

The jury returned verdicts against all defendants in the amounts of $115,000 for plaintiff Tri-Chem, and $40,000 for plaintiff Taco Bell. Plaintiffs and defendants both appealed. Our disposition of defendant's appeal makes plaintiffs' appeal moot.

### FACTS

Plaintiffs' property is located in an industrial tract in Torrance, the topography of which is described "as a sump with drainage characteristics similar to a bathtub." Because of hillside areas to the south, water in this part of the county runs north. Waters from the hills run northward in underground channels, emerging into a large open ditch called the Airport Ditch, which ends at Crenshaw Boulevard, a north-south street. The ditch is west of Crenshaw; plaintiffs' property is east. Amsler Street, the lowest portion of plaintiffs' property, runs east and west through the property, and dead ends into Crenshaw.

---

[1]The trial court directed verdicts in favor of the County defendants on the negligence theory, and denied injunctive relief on the nuisance theory. An appeal from that denial has been abandoned.

There are drains in Crenshaw Boulevard and Amsler Street. The only way that water in plaintiffs' property can be evacuated is through the Amsler Street drain. Water running through the Airport Ditch, which is sandbagged to prevent water from overflowing across Crenshaw, runs into the Crenshaw drain. Water entering the Crenshaw and Amsler drains runs into the Crenshaw-Amsler drainage line.

The Crenshaw-Amsler drainage line was designed and built by defendant County. The project was designed in 1953 to have an upstream—e.g., at Crenshaw and Amsler—capacity of 596 cubic feet per second (CFS), and downstream, or outlet, capacity of 760 CFS. The drain line was to connect to an outlet drain that had been built in the 1940's with a capacity of only 700 CFS. Before the project was constructed, the County redesigned the Crenshaw-Amsler line to reduce the downstream, or outlet, capacity to 700 CFS and the upstream, or inlet, capacity to 550 CFS.

Responsibility for this system is divided. The City maintains the Airport Ditch, the origin of which is unknown, and has built and maintained the sandbag dam. The Amsler Street drain was built by private parties when plaintiffs' tract was developed, and when the City annexed that tract in 1958, it assumed maintenance of the Amsler drain, which in 1966 it modified by raising the level of the grates to prevent clogging. The County built and maintains the Crenshaw drain, the Crenshaw-Amsler line, and the outlet.[2]

The 550 CFS capacity of the line at the Crenshaw drain was equivalent to the runoff expected from a two-to-three-year storm.[3]

On January 20, 1969, during a 17-year storm, about 1,096 CFS reached the area of the Crenshaw drain. During the night, water overflowed the top of the sandbag dike protecting the Airport Ditch. Then the dike broke. The Crenshaw drain was under four feet of water, which flowed across Crenshaw Boulevard toward the Amsler Street drain which was also about four feet deep in water. Plaintiffs' property was flooded and substantially damaged.

[2]We have combined the roles of the County of Los Angeles and the County of Los Angeles Flood Control District.

[3]At points, the capacity of the Airport Ditch was considerably greater. The Amsler Street drain had a capacity of about 130 CFS, depending upon the height of the water above it. Both the Ditch and the Amsler Street drain, as noted, connected to the Crenshaw-Amsler line.

On January 25, 1969, there was more flooding. During a 2.8-year storm, about 577 CFS reached the Crenshaw drain after the heaviest rain. Plaintiffs' property was again flooded, though to a lesser depth than on January 20. Nearly all of the damage to plaintiffs' supplies or inventory occurred on January 20.

## DISCUSSION

We note again that the County defendants constructed and maintained the Crenshaw drain and Crenshaw-Amsler drainage line, and that the City defendant maintained the Airport Ditch and Amsler Street drain. On appeal, all defendants contend that they are not liable on an inverse condemnation theory, because their conduct was not a proximate cause of plaintiffs' harm. We agree. Defendant City contends also that there is no substantial evidence that it was negligent in maintaining its portion of the system, or that the City was the proximate cause of plaintiffs' harm.[4] We agree that plaintiffs failed to establish that the City's conduct caused their harm.

## INVERSE CONDEMNATION[5]

■ The evidence is undisputed, first, that plaintiffs' property was a natural sump, lake, or bathtub, and, second, that without the benefit of the project, the flooding of their property would have been worse.[6]

---

[4]The relationship between negligence and inverse condemnation is complex. (See, generally, *Albers* v. *County of Los Angeles*, 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129]; *Youngblood* v. *Los Angeles County Flood Control Dist.*, 56 Cal.2d 603, 607 [15 Cal.Rptr. 904, 364 P.2d 840]; *Sheffet* v. *County of Los Angeles*, 3 Cal.App.3d 720, 732-735 [84 Cal.Rptr. 11]; Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L. J. 431.)

[5]In this part of our discussion, we need not distinguish between the County and City defendants. We treat the Airport Ditch, the Amsler Street drain, the Crenshaw drain, and the Crenshaw-Amsler drainage line as a "system" or "project."

[6]"Q. There has been an allegation . . . that the Flood Control project, as it now is, is likely to cause further floods and damages . . . . Do you agree with that?
"A. [PLAINTIFFS' EXPERT QUIGLEY] I would think that if that drain were closed off altogether, that every time it rains you would have water in the sump area.
"Q. You would have a mass flood if you didn't have this drain; is that correct?
"A. Yes.

. . . . . . . . . . . . . . . . . .
"A. . . . Now, what would be the result if this [the Flood Control project] were not permitted to be used?
"A. Every rainfall would cause a ponding of some depth.
"Q. In effect, all the rain that came down the watershed would be in this bowl, would it not?

■ Defendants' right to flood plaintiffs' property is no less than the right of a private landowner in a similar situation. (*Archer* v. *City of Los Angeles,* 19 Cal.2d 19, 24 [119 P.2d 1].) These rights often vary depending upon whether the waters are characterized as flood waters. (See *LeBrun* v. *Richards,* 210 Cal. 308, 314-316 [291 P. 825, 72 A.L.R. 336]), surface waters (see *San Gabriel V.C. Club* v. *Los Angeles,* 182 Cal. 392, 398-399 [188 P. 554, 9 A.L.R. 1200]) or channel waters (*Archer* v. *City of Los Angeles, supra,* 19 Cal.2d 19, 24-27.)[7]

■ In this case the differences do not matter. For defendants to be liable to plaintiffs, their conduct must, minimally,[8] have resulted in more water than would have otherwise flowed onto the plaintiffs' land, which greater quantity results in damage. (E.g., *Shaw* v. *Sebastopol,* 159 Cal. 623, 626 [115 P. 213]; *Turner* v. *Hopper,* 83 Cal.App.2d 215, 218 [188 P.2d 257] [surface waters]; *McManus* v. *Otis,* 61 Cal.App.2d 432, 446 [143 P.2d 380] [flood waters]; *Clement* v. *State Reclamation Board, supra,* 35 Cal.2d 628, 639-640 [channel waters].)

This obvious proposition was recently reaffirmed in *Shaeffer* v. *State of California,* 22 Cal.App.3d 1017, 1020-1021 [99 Cal.Rptr. 861], in which property owners complained that, had a flood control project been completed, they would not have been flooded: "If such flood control improvements do not subject a landowner's property to any additional flooding than would have occurred absent the work or improvement, the state incurs no liability for the acts complained of. [Citations.]"

The principle on which *Shaeffer* was decided is precisely in point. All that the record here shows is that a more extensive flood control system might have diverted more water from its natural flow across plaintiffs' properties. There is no evidence that the system did not work as it was

---

"A. It would.

. . . . . . . . . . . .

"It would be my opinion that any drain is better than none. I know nothing about the legal ramifications of it, but from an engineering standpoint, getting rid of one cubic foot of water is better than getting rid of none."

[7]Channel water: right to flood if water overflows existing but improved watercourse (e.g., *Archer* v. *City of Los Angeles, supra,* 19 Cal.2d 19, 24-25) flood water: right to flood to repel "common enemy" (e.g., *LeBrun* v. *Richards, supra,* 210 Cal. 308, 314; but see, *Keys* v. *Romley,* 64 Cal.2d 396, 400-405 [50 Cal.Rptr. 273, 412 P.2d 529]); surface waters: right depends on "reasonableness," whether upper or lower landowner, whether means artificial (*Keys* v. *Romley, supra,* 64 Cal.2d 396, 409-410; *Burrows* v. *State of California,* 260 Cal.App.2d 29, 32-33 [66 Cal.Rptr. 868]).

[8]If the landowner improves an existing channel, the plaintiff must also show diversion of waters from that channel. (E.g., *Clement* v. *State Reclamation Board,* 35 Cal.2d 628, 637-638 [220 P.2d 897].)

designed to function, no evidence that it caused any sudden surges or even accelerated the flow, no evidence that any water which reached plaintiffs' properties did not follow the natural drainage pattern. Plaintiffs' argument necessarily assumes that defendants had a *duty* to improve on nature. It is, however, well established that the state has no duty to construct a flood control system. (E.g., *Stone* v. *L.A. County Flood Control Dist.,* 81 Cal.App.2d 902, 912 [185 P.2d 396]; *Janssen* v. *County of Los Angeles,* 50 Cal.App.2d 45, 56-57 [123 P.2d 122].) Thus, whether we analyze defendants' conduct in terms of duty—limited to not making matters worse—or causation, there is no evidence to support imposing liability on defendants.

A case remarkably similar to this one is *Womar* v. *City of Long Beach,* 45 Cal.App.2d 643 [114 P.2d 704]. There, the plaintiff's property was located in a natural depression (45 Cal.App.2d at p. 648), and had been subject to flooding even before the improvements complained of. (*Id.,* at p. 652.) The city then graded various streets in the area. The plaintiffs tried to enjoin the city from causing or permitting waters to flow on their property on the theory that the city's conduct had caused water to be diverted to and accumulate on their property. The Court of Appeal, in reversing a judgment in favor of the plaintiffs stated:

"[T]he grading and paving of the streets contributed little, if anything, to the conditions which caused plaintiffs' property to be flooded . . . ." (*Id.,* at p. 659.) "[I]n the instant case there has been no direct causal connection established between the flooding of plaintiffs' property and the paving and grading of the streets." (*Id.,* at p. 660.)

"The question here being one solely of the duty of appellant city to provide adequate drainage, and it appearing that there was no absolute duty impose upon appellant to do anymore than it had done under the circumstances, and there being no evidence of negligence or trespass on the part of the city, or of the condition having in any manner been caused by the city, it follows that the trial court was not justified in finding upon the evidence presented that the condition complained of existed through the negligence of appellant city in failing to remedy the same." (*Id.,* at pp. 662-663.)

The fallacy of plaintiffs' theory of liability is exposed in their brief: "It was, and is Plaintiffs' position that these Defendants, by incorporating within their design of the flood control system the existing *natural* and man-made channels and ditches, including the Airport Ditch, assumed

responsibility for the adequacy of these elements of the system." (Italics added.)

Plaintiffs, thus, wanted the court to view defendants not just as the creators of a system which admittedly diminished surface run-off but also as the adoptive Creator of the natural watershed which channeled such run-off toward and across their properties in the first place.

Plaintiffs, apparently recognizing their predicament, assert that had there been no flood control system, run-off from the surrounding hills would have fanned out in the valley and not concentrated on plaintiff's property. The assertion is totally unsupported by the record. No one at any time presented any evidence whatsoever that the flood control system did more harm than good.[9]

Plaintiffs also assert—again without evidentiary support—that even assuming that the system was reasonably designed in 1954, the condition of the land changed in about 1958, when the tract was developed. In support of their changed conditions theory, plaintiffs rely on *Baldwin* v. *State of California,* 6 Cal.3d 424 [99 Cal.Rptr. 145, 491 P.2d 1121], for the

---

[9]It is, of course, impossible to support the absence of evidence by specific reference to a record, particularly if it contains—as this one does—over 100 exhibits and almost 1,000 pages of reporter's transcript. We are, however, aided to some extent by certain false leads in plaintiffs' brief and oral arguments:

(1) Plaintiffs point to a concrete block wall on the eastern or down-stream side of their property which, they assert, had drainage holes in it through which a certain amount of water could flow. The reference to this wall is designed to show that the industrial area was not a perfect "bathtub." It appears, however, that the foot of the wall was several feet above the Amsler Street drain—the tub's only "plug"; that there may have been no holes in the wall in 1969, and that there is no evidence that they were drainage holes. In any event, it is hard to see how the presence or absence of the holes has any bearing on defendants' responsibility for water that reached the industrial tract.

(2) Plaintiffs point out that their property could absorb about 260,000 cubic feet of water before "any water would enter the buildings occupied by" plaintiffs. All this means is that even at the low run-off figures used by plaintiffs' expert, the "bathtub" would take just a few minutes to fill up before additional water started to cause damage. Since, however, the threshold question is whether any of defendants' acts or omissions makes them responsible for any water which entered the tract, the whole point is immaterial.

(3) Plaintiffs claim that the sandbag dike west of Crenshaw was negligently constructed and maintained by the defendant City. It did give way during both the January 20 and January 25 storms. Again, however, there is no evidence which links any water which reached plaintiffs' properties to the failure of the dike. Its purpose, as noted, was to channel water into the Crenshaw drain, thereby preventing it from flowing across Crenshaw. The drain was, however, working to capacity: the record shows that there was so much water that it flowed across Crenshaw even before the dike broke. Again, there just is no causal connection between the evidence pointed to by plaintiffs and the water which entered their properties. Whether that water crossed Crenshaw Boulevard in spite of the dike or because it was no longer there is quite immaterial.

proposition that the government has a duty to take corrective action when conditions change.

*Baldwin* involved the California Tort Claims Act and an action for negligence, not inverse condemnation; the issue was whether the design immunity afforded the governmental entity had "perpetual life." (6 Cal.3d at p. 431.) In rejecting the concept of "perpetual life," the court pointed out that "despite the immunity provided by section 830.6, article I, section 14, of the state Constitution subjects all public entities in California to liability under an inverse condemnation theory for injury to *property* caused by public works. . . . [W]here property is involved, a public entity is already under a continuing obligation to review the design of its public works in order to avoid liability imposed by article 1, section 14." (*Id.,* at p. 438. Italics in original.)

*Baldwin* involved a dangerous condition in a highway, and we doubt that the Supreme Court intended in language that even in that case was dicta to abrogate the traditionally limited duty of the government to make flood control improvements. (See *Shaeffer* v. *State of California, supra,* 22 Cal.App.3d 1017, 1021.)

To summarize: no basis for inverse condemnation liability was shown.[10]

## NEGLIGENCE

■ The jury may have found against defendant City of Torrance on a theory of negligence—either in maintaining the Airport Ditch or the Amsler Street drain, or both. Again, there is no evidence that any negligence in maintaining the ditch or the drain was a proximate cause of plaintiffs' damage.

Plaintiffs' expert testified that on January 20, a maximum flow of 1,096 CFS and on January 25 a maximum of 577 CFS reached the Crenshaw drain. The capacity of the drainage line at the Crenshaw drain was 550 CFS. The ditch, as noted, led into the Crenshaw drain; the Amsler Street drain led into the same drainage line as the Crenshaw drain, but at a

---

[10]We have carefully restudied such cases as *Clement* v. *State Reclamation Board, supra,* 35 Cal.2d 628, 638; *Natural Soda Prod. Co.* v. *City of L.A.* 23 Cal.2d 193, 197 [143 P.2d 12], and *Granone* v. *County of Los Angeles,* 231 Cal.App.2d 629, 646 [42 Cal.Rptr. 34], which recognize liability on some theory in superficially similar situations. Each case, however, in one form or another, involves the abandonment of or failure to maintain an apparently permanent change in the natural flow of waters. None is in point.

lower point. Thus, assuming the City negligently maintained the ditch or the Amsler Street drain, any such negligence could have caused harm only if the Crenshaw drain could have absorbed the waterflow.

Yet, plaintiffs' expert admitted that the cause of the January 20 flood was that the "storm drain system was not adequate to remove that quantity of water." He admitted that if the Crenshaw drain was taking its capacity, any water which entered the Amsler Street drain would have further reduced the capacity of the Crenshaw drain, and "all of the excess would all end up in the same place." He also agreed that if the Crenshaw drain had worked to capacity, it was "completely immaterial whether the sandbags worked or didn't work, . . ." The only basis for connecting the City's conduct with any of plaintiffs' damage was the expert's opinion that on January 25 there "had to be some kind of stoppage" in the Crenshaw drain, but that opinion was based on his demonstrably erroneous[11] "assumption that the Crenshaw line will take 599 cubic feet per second, . . ."

In brief, if there was negligence, it caused no damage.

## CONCLUSION

There was no evidence, under either an inverse condemnation theory or a negligence theory, that defendants' conduct had proximately caused plaintiffs' harm. The evidence is uncontroverted that the flood control system, whether or not inadequate, reduced the natural flooding of plaintiffs' property. The evidence is also uncontroverted that the water flow from both storms exceeded the inlet capacity of the drainage line into which water entering the drains and ditch flowed. Thus, any negligence by defendant City in maintaining the drain and the ditch did not cause plaintiffs' damage.

## PLAINTIFFS' APPEAL

Plaintiffs' appeal stems from the trial court's refusal to award them attorneys' fees and expert costs. It is clearly moot.

[11]The undisputed evidence, as noted, was that although the Crenshaw Drain was originally designed for a capacity of 596 CFS, the design was modified to reduce that capacity to 550 CFS. Plaintiffs' expert was asked if he had calculated the maximum inlet capacity of the Crenshaw-Amsler line. He said that he had not, that there "is a reference to the capacity in the County's figures, which is a reasonable amount," an amount which he "believe[d] was 599 cubic feet per second." It turned out that plaintiffs' expert was reading from a County report (Plaintiffs' Exhibit 71). That report, however, is what led to the conceded reduction in both the inlet and outlet capacity of the Crenshaw-Amsler line.

## DISPOSITION

The judgments are reversed. Defendants to recover costs on both appeals.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied June 10, 1976. The petition of appellant Tri-Chem, Inc. for a hearing by the Supreme Court was denied July 15, 1976.