[Civ. No. 28376. Fourth Dist., Div. One. Apr. 24, 1985.]

IMPERIAL CATTLE COMPANY, Plaintiff and Appellant, v.
IMPERIAL IRRIGATION DISTRICT, Defendant and Appellant.

264

## COUNSEL

Lowell F. Sutherland, Neil & Gerber and Sutherland & Gerber for Plaintiff and Appellant.

Reeve J. Jacques, Virginia R. Gilson, McInnis, Fitzgerald, Rees, Sharkey & McIntyre, Reginald L. Knox, Jr., and Horton, Knox, Carter & Foote for Defendant and Appellant.

## OPINION

**WIENER, J.**—Defendant Imperial Irrigation District (the District) appeals a judgment entered after a jury found it liable to plaintiff Imperial Cattle Company on theories of inverse condemnation and nuisance for approximately $192,000 in damages arising from the flooding of Imperial Cattle's feedlot in 1976 and 1977. Except to the extent that the trial court improperly calculated the amount of prejudgment interest due on the damage award, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Imperial Cattle operates a cattle feedlot next to the northern edge of the City of Imperial. The feedlot is generally rectangular in shape, with the

long sides of the rectangle running north-south. The property slopes to the north and east. The District maintains an easement along the eastern boundary of the feedlot which houses the Dolson Drain (Drain). The Drain is a water channel 8 to 10 feet deep, 30 feet wide at the top narrowing to 3 feet at the bottom. Water in the Drain flows south to north. The southern end of the Drain is located in a residential section of Imperial. Thereafter, the Drain continues north paralleling the elevated tracks of the Southern Pacific Railroad which lie just east of the Drain. The Drain crosses the Imperial city limits at the southeast corner of the feedlot and continues along the lot's eastern boundary. At the northeast corner of the lot, the Drain turns 90 degrees to the east and passes under the railroad tracks through a 36-inch culvert. Also at the northeast corner, a "waste box" and 12-inch pipe allows surface runoff from the feedlot to be discharged into the Drain.

When constructed in 1947, the Drain was designed to drain irrigation waters from surrounding agricultural fields. Because of the minimal average yearly rainfall in Imperial (two to two and one-half inches per year), the design of the Drain did not take into account storm drainage. Because there are no longer any agricultural fields south of Imperial Cattle's feedlot, the current function of the Dolson Drain is simply to receive and channel surface runoff from the northern sections of the City of Imperial.

Major tropical storms hit Imperial in the successive years 1976 and 1977. On each occasion, Imperial's combined storm drainage and sewer system was inadequate to handle the large amounts of rainwater, which caused rain and sewer water to back out of the sewer system and flood surface streets in the city. Much of this excess water eventually flowed into the Dolson Drain. When it reached the northeast corner of the Imperial Cattle lot, the volume of water exceeded the capacity of the 36-inch culvert under the railroad tracks, causing water and sewage to overflow the banks of the Drain and flood the feedlot. This lawsuit was the result of Imperial Cattle's claim against the District for damage caused by the flooding of the feedlot.

## DISCUSSION

The District's arguments on this appeal break down into four general categories. First, contentions are made regarding certain refused jury instructions and the sufficiency of the evidence which relate to liability. Second, the District alleges that certain evidence necessary to prove Imperial Cattle's damages was improperly admitted. Next, the District argues that the interest on the damage award was improperly calculated. And finally, the award of expert witness and attorney fees is challenged. We address each of these categories seriatim. We then consider an issue raised by Imperial Cattle's purported cross-appeal.

## I

Two jury instructions proposed by the District were refused by the court. With respect to establishing the cause of action for inverse condemnation, the District suggested the jury be instructed as follows: "Inverse condemnation occurs when a public project, operating as designed and conceived, proximately causes damage to private property."[1] In support of the instruction, the District relies on the Supreme Court decision in *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129] and its progeny. The question presented in *Albers* was whether a public entity could be liable in inverse condemnation where a public project unforeseeably caused damage to a property owner. (*Id.*, at pp. 261-262.) *Albers* concluded that ". . . any actual physical injury to real property proximately caused by the improvement as deliberately designed and constructed is compensable under article 1, section 14, of our Constitution whether foreseeable or not." (*Id.*, at pp. 263-264.)

■ The District contends that the failure to give its requested instruction removed the "deliberate design" requirement from the jury's consideration.[2] It points to the evidence establishing that the Dolson Drain was never designed to provide storm drainage and suggests that this fact should preclude a finding of inverse condemnation.

In support of its argument, the District relies on cases in which some aspect of the public improvement malfunctioned, causing the damage. (See, e.g., *Yee* v. *City of Sausalito* (1983) 141 Cal.App.3d 917 [190 Cal.Rptr. 595]; *McMahan's of Santa Monica* v. *City of Santa Monica* (1983) 146 Cal.App.3d 683 [194 Cal.Rptr. 582].) Not surprisingly, the argument made in those cases was that the damage was not caused by the project operating "as deliberately designed and constructed" since, presumably, the public projects were not designed or constructed to malfunction.

We need not opine on the correctness of the malfunction type cases. In any event, the proposed instruction would not have aided the District here.

---

[1] Instead, the jury was instructed on inverse condemnation as follows: "To recover compensation in inverse condemnation the plaintiff must prove that (1) he had an interest in real or personal property; (2) that the defendant approved, constructed, or operated a public project; (3) that plaintiff's property has been damaged; (4) that defendant's project, act or omission was a substantial cause of the damage." This instruction is as suggested in Condemnation Practice in California (Cont.Ed.Bar Supp. 1982) section 13.33.

[2] We note that the District's proposed instruction reads "deliberately designed and *conceived*" whereas *Albers* speaks of "deliberately designed and *constructed.*" While the trial court may have been justified in rejecting the proposed instruction on this basis alone (see *Hardin* v. *Elvitsky* (1965) 232 Cal.App.2d 357, 372 [42 Cal.Rptr. 748]), we do not resolve the contention on that basis.

The Drain was "designed and conceived" with a 36-inch culvert crossing under the railroad tracks. It is precisely because a 36-inch culvert, "operating as designed and conceived," was inadequate to accommodate rainwater runoff that the flooding of the feedlot occurred.

We note, moreover, that the improper design of a public improvement is a recognized basis for a claim of inverse condemnation. In *Granone* v. *County of Los Angeles* (1965) 231 Cal.App.2d 629 [42 Cal.Rptr. 34], for instance, the defendant governmental entities defectively designed a flood control channel which overflowed, flooding plaintiff's property. The court concluded that "the public improvement was not planned and constructed in accordance with good engineering practices . . ." and the defendants were therefore liable in inverse condemnation. (*Id.*, at p. 647; see Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 437; see also *Yee* v. *City of Sausalito, supra,* 141 Cal.App.3d at p. 922.) We recognize that *Granone* involved a public improvement which was improperly designed for its intended purpose whereas in the present case, the District contends the Drain was not designed to carry rainwater. In response, we observe that the testimony by the District witness on this point was not so much that the Drain was not intended to carry rainwater but rather that the small amount of annual rainfall in Imperial made that factor insignificant in the District's determination as to what size culvert to install. Certainly it would have been impossible for the District to exclude rainwater while allowing surface runoff from other sources to enter the Drain. Furthermore, the District's proffered standard, which allows liability to turn on the subjective intent of the designer, would encourage public entities to hire designers of limited intelligence and minimal foresight. Such a result commends itself neither to common sense nor sound public policy. We accordingly conclude the trial court did not err in refusing the District's proposed inverse condemnation instruction.

■ Similarly unnecessary was the District's second proposed jury instruction, to the effect that "[a]n irrigation district is not required by law to provide, maintain, or operate flood control facilities." The District suggests that the trial court's failure to give its proposed instruction "left the jury with the erroneous impression the District was responsible for eliminating flooding from plaintiff's property." Other jury instructions given, however, belie any such suggestion. The jury was specifically instructed that "[f]or [the] District to be liable to plaintiff, its project must have resulted in more water than would have otherwise flowed onto plaintiff's land which greater quantity results in damage." (See *Tri-Chem, Inc.* v. *Los Angeles County Flood Control Dist.* (1976) 60 Cal.App.3d 306, 311 [132 Cal.Rptr. 142].) Following such an instruction, the jury could not possibly have imposed

liability on the district because it mistakenly believed the District was responsible for eliminating the possibility of a flood.

■ Finally, however, the District claims that liability cannot be imposed even on the instructions as given because the evidence was insufficient to support a finding that the Dolson Drain caused the flooding of the feedlot. More particularly, the District argues the evidence establishes that the same or greater flooding of the feedlot would have occurred in the absence of the Drain. In support of this argument, the District points to testimony indicating that the northeast corner of the Imperial Cattle feedlot is the lowest drainage point in the area—a natural sump—bounded by a raised roadway on the north and elevated railroad tracks on the east. Thus, the District contends, the flood waters flowing from the City of Imperial would have collected in the northeast corner of the feedlot even if the Dolson Drain did not exist.

While there is testimony from the District's expert witness to support such a theory our function on appeal is not to reweigh the persuasiveness of the testimony but rather to determine whether the evidence presented at trial was sufficient to allow a reasonable jury to return a verdict in favor of Imperial Cattle. In this context, we note that an earthen berm surrounded the feedlot on all sides except at the location where the Dolson Drain intersected the southern boundary of the lot. An expert witness for Imperial Cattle testified that if the Dolson Drain were not present and, therefore, if there were no breach in the berm to allow for the Dolson Drain, the combined rain and sewer waters from Imperial would never have crossed the southern boundary and flooded the feedlot. The jury was entitled to accept this testimony and reject that of the District's expert. In doing so, the jury could reasonably have concluded that the existence of the Dolson Drain was a substantial cause of the flooding of the feedlot, and therefore that the District was liable on theories of inverse condemnation and nuisance.

## II

A significant item of damage claimed by Imperial Cattle related to livestock which contracted measles as a result of consuming sewage deposits left by the floodwaters. Following slaughter at the packing house, the carcasses of measled cattle were condemned by veterinarians employed by the United States Department of Agriculture (U.S.D.A.). Once condemned, Imperial Cattle was then sent an invoice by the packing house demanding a discount or repurchase of the condemned carcasses. Imperial Cattle claimed damages for the amounts it was required to rebate to packing houses for the condemned carcasses.

■ The District challenges the means by which Imperial Cattle attempted to prove its damages resulting from the measled beef. Specifically, the District contends the condemnation certificates issued by the U.S.D.A. veterinarians and the invoices from the packing houses constitute inadmissible hearsay.

The condemnation certificates appear to fall clearly within the "official records" exception to the hearsay rule. Evidence Code section 1280 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: (a) The writing was made by and within the scope of duty of a public employee; (b) The writing was made at or near the time of the act, condition, or event; and (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness." The record demonstrates that condemnation certificates are prepared by veterinarians employed by the federal government following an inspection of each cattle carcass if the veterinarian determines that the meat is infected with measles. Such evidence not only satisfies the first two predicates to the invocation of section 1280 but also indicates the basic trustworthiness of the documents. The court therefore properly admitted the condemnation certificates.

We similarly believe the invoices were properly admitted. In conjunction with the introduction of the invoices, the co-owner and manager of Imperial Cattle, James Delfino testified that he received the invoices from the packing houses and arranged for their payment. ■ As the Supreme Court explained in *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]: "Since invoices, bills, and receipts for repairs are hearsay, they are inadmissible independently to prove that liability for the repairs was incurred, that payment was made, or that the charges were reasonable. [Citations.] If, however, a party testifies that he incurred or discharged a liability for repairs, any of these documents may be admitted for the limited purpose of corroborating his testimony [citations], and if the charges were paid, the testimony and documents are evidence that the charges were reasonable." (*Id.,* at pp. 42-43; accord *McAllister* v. *George* (1977) 73 Cal.App.3d 258, 263 [140 Cal.Rptr. 702]; *Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 626 [124 Cal.Rptr. 143].) Such a rule may be supported by the observation that a party who receives a bill or invoice normally has every interest to dispute its accuracy or reasonableness if there is reason to do so. ■ Thus, if a bill or invoice is paid, the court is assured of the accuracy and reasonableness of the charges. Accordingly, the trial court did not err in admitting the measled beef invoices sent by various packing houses to Imperial Cattle.

### III

█ The trial court awarded prejudgment interest to Imperial Cattle at a rate of 10 percent reflecting the market rate of interest during the relevant period. At the same time, the maximum legal rate of interest provided for in article XV, section 1 of the California Constitution was 7 percent. The District contends the court erred in awarding 10 rather than 7 percent interest on the amount of the damage award.

The approach adopted by the trial court is apparently based on a number of federal cases interpreting the just compensation clause of the Fifth Amendment to require the payment of market rate interest where there has been a pretrial taking of private property by a governmental entity. (See, e.g., *Miller* v. *United States* (Ct. Cl. 1980) 620 F.2d 812, 837-838; *United States* v. *429.59 Acres of Land* (9th Cir. 1980) 612 F.2d 459, 464-465; *United States* v. *Blankinship* (9th Cir. 1976) 543 F.2d 1272, 1275-1276.) In the reasoning of such cases, the Fifth Amendment right to just compensation would supercede the lower interest rate set by the California Constitution.

This court previously had occasion to note the arguments in favor of market rate interest as a corollary of the federal constitutional right to just compensation. (See *L & M Professional Consultants, Inc.* v. *Ferreira* (1983) 146 Cal.App.3d 1038, 1057 [194 Cal.Rptr. 695]; but see *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 165 Cal.App.3d 952 [212 Cal.Rptr. 701].) The issue is currently before the Supreme Court in *Redevelopment Agency* v. *Gilmore* (L.A. 31891, hg. granted Mar. 29, 1984). We may thus expect a definitive ruling on the question in the near future.*

Each of the cases cited by Imperial Cattle in support of the award of market rate interest involve direct condemnation by a public entity. Whatever persuasive force this constitutional "market rate theory" has, it is most compelling where a government entity uses its power of condemnation to take private property before paying the owner its fair market value. Arguably, the same rationale is applicable to those inverse condemnation cases which are merely a substitute for direct condemnation, that is, where the government has intentionally taken or damaged a citizen's property interest without prior payment. (See, e.g., *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 351, 354 [144 P.2d 818].)

Whatever should be the rule in such cases—a question we anticipate will be answered by the Supreme Court in *Gilmore, supra*—we believe a clearly distinguishable situation is presented by those inverse condemnation cases like the present one where the claimed damage is neither intentional nor

---

*Reporter's Note: For Supreme Court opinion see 38 Cal.3d 790.

immediate. Inverse condemnation under such circumstances appears very much to be a special specie of tort liability applicable only to the government.[3] Such an observation is undoubtedly consistent with the pre-*Albers* rule (*Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250) that the state could not be liable for inverse condemnation unless a private party inflicting the same damage would also be liable to the plaintiff. (*Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19, 24 [119 P.2d 1].) *Albers,* in our view, does not invalidate the observation.[4] In fact, the cost-internalization and risk-spreading rationales underlying *Albers* (see especially *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 303, 310-311 [90 Cal.Rptr. 345, 475 P.2d 441]) do not differ significantly from the economic policy arguments advanced in support of strict products liability (see, e.g., *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461-462 [150 P.2d 436] (conc. opn. of Traynor, J.)) or workers' compensation (see, e.g., Prosser, Torts (4th ed. 1971) § 80, pp. 530-531).[5]

There would of course be nothing to preclude the Legislature from providing for the award of market rate prejudgment interest in all tort cases or even all tort cases against the government. But we question the logic and fairness of a rule which would allow such interest in that limited number of unintentional damage cases which can be molded into an inverse condemnation rubric while denying similar interest in all other cases. Pending guidance from the Supreme Court, we believe the federal Constitution does not mandate interest in excess of the "legal" rate in cases where the plaintiff

[3]Numerous commentators have recognized the tort underpinnings of inverse condemnation law, especially in those situations where an inverse action is not merely a substitute for a direct action. (See, e.g., Van Alstyne, *op. cit. supra,* 20 Hastings L.J. 431; Mandelker, *Inverse Condemnation: The Constitutional Limits of Public Responsibility,* 1966 Wisc. L.Rev. 3, 6, 13-17.) Professor Mandelker suggests it is useful to distinguish between inverse condemnation damages which could be recovered in a direct condemnation action and those which could not. (*Id.,* at pp. 4-6.) When we speak of damage which is "neither intentional nor immediate," we refer to that which could not be recovered in a direct condemnation proceeding.

[4]We emphasize that our reference to inverse condemnation as analogous to a tort cause of action is in no sense intended to suggest that the *standard of liability* for public entities should necessarily be identical to similarly situated private parties. That argument was clearly rejected in *Albers.* We only point out that for the purposes of the amount of prejudgment interest, we can see no rational way of distinguishing between traditional tort claimants against the government and certain inverse condemnation claimants.

[5]One early commentator, describing the rationale for inverse condemnation later adopted by the *Albers* court, explained that it "would impose liability for damage flowing from the operation of a business enterprise even in the absence of legal fault. This view regards liability for harm connected with an enterprise as a normal business expense and is the result of a preference for security, even if this means some stifling of progress. Loss, under this view, is allocated to the superior risk bearer, the party better equipped to pass it on to the public. There is also the feeling that those who enjoy the fruits of an enterprise must also accept its risks." (Kratovil & Harrison, *Eminent Domain—Policy and Concept* (1954) 42 Cal.L.Rev. 596, 621.)

sues in inverse condemnation to recover for damages which were not intentionally or immediately caused by the operation of a public improvement.[6]

## IV

█ Finally, the District attacks the trial court's award of attorney and expert witness fees to Imperial Cattle on a variety of grounds. The award was based on Code of Civil Procedure section 1036 which states: "In any inverse condemnation proceeding brought for the taking of any interest in real property, the court rendering judgment for the plaintiff by awarding compensation for such taking, . . . shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will, in the opinion of the court . . . reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding."

Specifically, the District contends: 1) Section 1036 only allows recovery of fees where there has been a taking. Here there was no taking of plaintiff's property, only damage, and therefore no fees can be awarded.

2) Even if there has been a taking within the meaning of section 1036, the statute clearly provides that the taking must be "of [an] interest in *real property* . . . ." (Italics added.) Here, the vast majority if not all of Imperial Cattle's damages were for injury to personal property and thus the trial court erred in awarding any fees or, at the very least, in failing to award only those fees attributable to proving damage to real property.

3) Similarly, the jury found for Imperial Cattle on both inverse condemnation and nuisance causes of action. Because fees are not recoverable in a nuisance cause of action, the trial court erred in failing to apportion the fees and deduct those attributable to nuisance.

4) The trial court erred in awarding attorneys fees based on a 40 percent contingency fee agreement previously negotiated between Imperial Cattle and its counsel. The documentation regarding the number of attorney hours involved in the case was insufficient to establish that the 40 percent amount was reasonable.

We note preliminarily that with the exception of the District's second argument, the contentions raised on this portion of the appeal were not

---

[6]We note in this context that the facts of the present case would not appear to give rise to liability under federal law on an inverse condemnation theory. (See *Barnes* v. *United States* (Ct. Cl. 1976) 538 F.2d 865, 870 ("Government-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort.").)

directly argued to the trial court in the motion to tax costs.[7] As our discussion below demonstrates, this factor supports our decision to affirm as to at least two of those three contentions. (See generally *Dimmick* v. *Dimmick* (1962) 58 Cal.2d 417, 422 [24 Cal.Rptr. 856, 374 P.2d 824].)

### A

Although the District's trial counsel's argument does not highlight the first contention, attempting to distinguish a "taking" from mere "damage," Imperial Cattle's counsel's oral opposition to the motion to tax did address the question. We thus assume the issue was adequately framed for the trial court. In any event, to the extent the District can or chooses to press the contention, it is adequately disposed of in *Orme* v. *State of California* ex rel. *Dept. Water Resources* (1978) 83 Cal.App.3d 178, 183-185 [147 Cal.Rptr. 735] which, like the present case, involved the temporary flooding of property. The court there concluded that "when a public agency causes injury to property by subterranean or surface flooding, even though the flooding is temporary in nature only, a taking of property within the meaning of Code of Civil Procedure section 1246.3 (now § 1036) occurs and litigation costs are recoverable." (*Id.*, at p. 185; accord *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.*, *supra*, 165 Cal.App.3d at p. 985.)

---

[7]At the hearing on the motion to tax costs, the District's counsel argued as follows: "Your Honor, the sole issue on this motion to tax costs is whether or not the plaintiff is entitled to attorneys' fees and costs of expert witnesses. The only basis on which attorneys' fees or the cost of expert witnesses could be allowed by the court would be under section 1036 of the Code of Civil Procedure.

"Now, that section provides in any inverse condemnation proceeding brought for the taking of any interest in real property and this is the important part, for the taking of any interest in real property. Now, it is our contention that this action insofar as it has been successful is only for damages to personal property such as grain, hay, straw, cattle and the like.

"The jury did not award any damages for taking of real property. The taking of real property is not involved in the case. Therefore, it is our contention that the motion should be granted on the basis that there is no authorization under section 1036 for the award of attorneys' fees and costs where only personal property is involved." It is also worthy of note with respect to the District's fourth contention that later in the hearing, the District's counsel, Mr. Knox, specifically disclaimed any intention to argue the reasonableness of the fee request when invited to do so by the trial judge:

"THE COURT: I don't know. Maybe it is not an issue, Mr. Knox, but you know the code says reasonable, does not just say actual costs, so there is some discretionary activity on the part of the court with respect to that.

"Go ahead, Mr. Knox.

"MR. KNOX: I have nothing to add, of course, on attorneys' fees if your honor choses [*sic*] to allow them. I think you're going to have to be the judge of what is reasonable. There is nothing to support the figure claimed except 40 some percent which probably is contingent fee arrangement. Whether that is reasonable under the circumstances, I don't know, and I really am not prepared to comment on it."

## B

The District's second contention, although clearly raised by the motion to tax, is also without merit. Although we are unaware of any past case interpreting Code of Civil Procedure section 1036 on this issue, we do not believe the "interest in real property" language in the statute was intended to preclude the award of attorney and expert witness fees where the damages claimed include or are even limited to items of personal property. The statute does not focus on the *damage* to real property. Rather, the "taking of [an] interest in real property" sufficient to invoke section 1036 in this case occurred when Imperial Cattle Company was deprived of the full use of its land due to flooding caused by the inadequate design of the Dolson Drain culvert. The fact that the property damaged as a result of the taking was historically labeled "personal," rather than being a building, growing crop, or something else traditionally designated "real," is purely fortuitous. In fact, an interpretation of section 1036 which granted fees to one category of plaintiffs but denied them to another on such a basis would call into question the statute's rationality.[8]

## C

The District's third contention presents an interesting metaphysical inquiry which we suspect would be of little practical import on the facts of this case. We further believe, however, that even our metaphysical curiosity cannot be indulged because of the District's failure to raise its contention before the trial court.

The District begins by correctly observing that one of the two theories on which Imperial Cattle was successful—i.e., nuisance—will not support the award of attorneys fees. From this, says the District, it follows that Imperial Cattle cannot recover all fees incurred in prosecuting the case but only those attributable to the inverse condemnation cause of action.

The District correctly cites *Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86, 103-104 [160 Cal.Rptr. 733, 603 P.2d 1329] in support of the general proposition that apportionment of fees between causes of action may sometimes be appropriate. *Greater Westches-*

---

[8]Even were we to require some damage to real property, we are satisfied that such an item of damage was awarded by the jury in the present case in the form of the costs incurred by Imperial Cattle in removing the contaminated manure from the feedlot. With tongue only lightly implanted in cheek, we observe that while manure starts out as personal property (of the steer, perhaps), it soon thereafter becomes real property. That the result in a case should possibly turn on such a point only demonstrates the absurdity of unthinking allegiance to the importance of the real-personal property distinction.

ter, however, does not significantly elaborate on the point and the District does not suggest any bases for its suggested apportionment. Two such bases occur to us. An ends-oriented methodology might calculate that portion of the damage award attributable to the inverse condemnation cause of action and award fees for only that proportion of the total fees incurred as the inverse condemnation damages bear to the total damage award. Such a methodology is perhaps suggested by the facts of *Greater Westchester,* where a portion of the damages awarded to plaintiffs were for personal injury claims not compensable under either direct or inverse condemnation. (See 26 Cal.3d at p. 92.) An alternative means-oriented methodology might evaluate the work done by each attorney and expert witness and exclude from the award compensation for any work not applicable to the inverse condemnation cause of action.[9]

Were we to apply the first methodology to the present case, we would be hampered by the fact that the record does not reveal whether any of the awarded damages were recoverable only on the nuisance cause of action. A review of the categories of damages awarded, however, suggests that all damages were recoverable on both causes of action and thus no apportionment would be necessary. Were we to apply the second methodology, we would be hampered by the fact that the record does not reveal the nature of the work performed by the attorneys and expert witnesses in sufficient detail to allow any apportionment to particular causes of action. We suspect, however, that the bulk of the work was necessary regardless of the cause of action being pursued. (See *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 165 Cal.App.3d at pp. 988-989.)

Under these circumstances, we cannot but conclude that the District's failure to raise the apportionment issue before the trial court precludes our consideration of its contention here. A timely request for special verdicts could have provided the information necessary for a proportion-of-damages calculation and raising the issue in the motion to tax costs could have allowed Imperial Cattle's attorneys to provide a more detailed account of their work in preparing and trying the case. There is no allegation that either tactic would have been futile. (Cf. *Sea & Sage Audubon Society, Inc.* v. *Planning Com.* (1983) 34 Cal.3d 412, 418 [194 Cal.Rptr. 357, 668 P.2d 664].) Accordingly, the trial court cannot be faulted for failing to apportion the attorney and expert witness fee awards between the two successful causes of action.

---

[9]Were transaction costs the only evaluative criterion, one can easily argue the desirability of the proportion-of-damages methodology. It would be infinitely simpler for a trial judge to apportion fees based on a relatively simple damages special verdict returned by the jury rather than review the detailed work records of each attorney and expert witness who has contributed in some manner to the preparation of the case.

D

██ We infer from the record that Imperial Cattle agreed with its attorneys before trial that the attorneys would be entitled to a 40 percent contingency fee. The trial court in fact awarded a 40 percent fee calculated as a percentage of the total damage award ($191,937) plus interest ($103,015) less the amount of a pretrial settlement with the City of Imperial ($62,950) for a total of $232,002. The court-awarded fee thus amounted to $92,800. In determining the reasonableness of the fee, the trial judge reviewed declarations submitted by Imperial Cattle's attorneys which showed the hours worked by those attorneys, if billed at their hourly rate, would have amounted to $90,025.

We have previously expressed our concern in this type of situation with a trial court's reliance on a percentage contingent fee negotiated by the client. (See *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 165 Cal.App.3d at pp. 989-990.) While justifiably subject to some criticism, the contingent fee serves the socially beneficial purpose of allowing many persons to pursue meritorious legal claims who would otherwise be unable to afford their day in court. Where the successful attorney's fee is paid out of the plaintiff's recovery, a percentage fee arrived at as a result of good faith bargaining between attorney and client is likely to represent a simple yet economically rational price agreement. This conclusion holds, however, only so long as the attorney and client are adverse with respect to the attorney's fee, i.e., the greater the fee, the less the recovery received by the client.

In an inverse condemnation case such as the present one, by virtue of Code of Civil Procedure section 1036, the attorney's fee is paid not out of the plaintiff's recovery but rather by the defendant over and above the damage award. Where a percentage fee is "negotiated" between attorney and client in such a situation, the resulting price for the attorney's services is not the product of arms-length bargaining because the attorney and client are not adverse with respect to the fee. As we recently emphasized in *Salton Bay Marina, Inc., supra,* "[W]hen the award is paid by the public entity, the bargaining in reaching a contingency fee agreement is of doubtful value since the bargaining was done by the client and his attorney rather than by the public entity and the bargaining is less likely to be a guarantee of reasonableness. If the public entity is bound to the contingent fee agreement, then the client lacks incentive to keep the attorney's share reasonable since the attorney's share will neither come out of the client's recovery nor be paid by the client." (*Id.,* at p. 990.)

The situation in the present case is complicated by the presence of the additional cause of action for nuisance. A percentage contingent fee in a

nuisance action would be paid by the client out of his recovery. Were there a substantial possibility of recovery on that cause of action alone, a percentage fee negotiated by the client might to a greater or lesser extent represent an appropriate pricing mechanism. But as we noted in the context of our earlier apportionment discussion (*ante,* p. 278), we think it likely that recovery in this case would be either on both theories or none at all. Thus, the percentage fee on which the court based the attorney fee award is inherently suspect.

We nonetheless believe reversal is not mandated. The District, clearly the adverse party as to the fee award, declined the invitation to directly argue the unreasonableness of the fee request (see *ante*, fn. 7), which is an extremely good indication that the request was reasonable. In any event, the trial court understood its independent obligation to assure that the fee award was reasonable, and the hourly time records and billing rates fully support the fees awarded. Under these circumstances, we believe the trial court's award of $92,800 in fees must be affirmed.

## V

Before the entry of judgment, Imperial Cattle moved to compel the District to deposit the amount of the judgment with the court pending appeal. Imperial's position was based on language in article I, section 19 of the California Constitution which would appear to require payment to the plaintiff or deposit into court prior to the taking.[10] Because that section is the source of the authority for inverse as well as direct condemnation proceedings, Imperial Cattle argued that the section required at the very least that the amount of a judgment be deposited into court pending an appeal.

The trial court denied Imperial Cattle's motion. The plaintiff thereafter sought relief from this court by way of a petition for writ of mandate. We summarily denied the petition. It now seeks to raise the same issue by way of a purported cross-appeal.

We are of the opinion that the trial court's denial of Imperial Cattle's motion is not an order from which an appeal lies. Any relief we could grant on the cross-appeal would duplicate that already implicit in our affirmation of the judgment. Accordingly, the cross-appeal is dismissed.

---

[10]Article I, section 19 provides in relevant part as follows: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to or into court for, the owner."

## DISPOSITION

The judgment is reversed to the extent it awards interest at a rate of 10 percent per year. The trial court is ordered to recalculate the interest award using a 7 percent figure. In all other respects, the judgment is affirmed. Imperial Cattle's purported cross-appeal is dismissed.

Brown (Gerald), P. J., and Butler, J., concurred.

Petitions for a rehearing were denied May 15, 1985, and the petitions of both parties for review by the Supreme Court were denied August 22, 1985. Kaus, J., did not participate therein.